## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

DENISE DERICKSON,                )
                                 )
    Plaintiff,                   )
                                 )
    vs.                          )    **Case number 4:15cv0299 TCM**
                                 )
CAROLYN W. COLVIN, Acting        )
Commissioner of Social Security, )
                                 )
    Defendant.                   )

## MEMORANDUM AND ORDER

This 42 U.S.C. §§ 405(g) and 1383(c)(3) action for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the applications of Denise Derickson (Plaintiff) for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b, is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

## Procedural History

Plaintiff applied for DIB and SSI in June 2011, alleging she was disabled as of December 23, 2010, by anxiety, depression, high blood pressure, and a lack of coordination in her dominate, right hand. (R.[1] at 190-98, 219.) Her applications were denied on initial review and following a hearing held in August 2013 before Administrative Law Judge (ALJ)

---

[1]References to "R." are to the administrative record filed by the Acting Commissioner with her answer.

Robin J. Barber.  (Id. at 6-19, 44-124.)  The Appeals Council then denied Plaintiff's request for review, thereby  adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-4.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and Delores E. Gonzalez, M.Ed., testified at the administrative hearing.

The substantive part of the hearing began with the ALJ asking Plaintiff if she was still drinking.  (Id. at 49.)  She replied that she was.  (Id.)  She drank approximately eight beers a day and, occasionally, drank "a shot of whiskey or something."  (Id.)  She smoked two packs of cigarettes a day.  (Id.)  She daily smoked marijuana.  (Id.)  She took her medications as prescribed.  (Id.)  Her boyfriend bought her cigarettes and alcohol.  (Id. at 50.)  She drank out of habit and to calm herself.  (Id. at 55.)  The longest period she had gone without drinking was approximately three weeks.  (Id. at 77.)  During that period, she was a lot more anxious and irritable, was easily aggravated, and was constantly tense.  (Id.)  She had felt sick to her stomach and shook.  (Id.)

Asked if she was going to occupational therapy for her hand, she relied that she had gone one time.  (Id. at 49-50.)  The provider was to call her back, but never did.  (Id. at 50.)  Nor did the provider respond to her calls.  (Id.)  She has not asked her boyfriend to pay for her medical care.  (Id.)

Monday through Thursday, she cared part-time for her grandchildren.  (Id. at 51, 79.)  She had been caring for them full-time, but became overwhelmed.  (Id. at 51.)  Also, her

- 2 -

daughter went to part-time work from full-time. (Id.) Plaintiff used to pay games on the computer, but now played games with friends using her phone. (Id. at 52.) She could do so using only one finger. (Id.)

She recently visited her son in San Diego. (Id.) He was going to be discharged from the Marines due to a "dirty test." (Id.) He and his wife were expecting and would move back to Missouri. (Id. at 54.)

Plaintiff could not use her right hand to start the car, feed herself, or push buttons. (Id. at 56.) Depending on shape, size, and weight, she could hold things in that hand if they were placed there. (Id.) She could not type with the right hand. (Id. at 57.) Using her left hand, Plaintiff could "hunt and peck" on a keyboard. (Id. at 75.) She had difficulty changing her grandson's diaper. (Id. at 78-79.)

Plaintiff testified that her use of her right hand had initially improved after she had a stroke in 2010. (Id. at 60.) The difficulties became permanent on December 23, 2010. (Id.) The only improvement she has had since has been to be able to use her right hand as "a little bit of a helper." (Id.)

Plaintiff takes aspirin, verapamil (used to treat high blood pressure), and lisinopril (for high blood pressure). (Id. at 61.) Also, she takes medication for her mental health, including Cymbalta (an anti-depressant). (Id. at 80.) Her doctor has not told her that using alcohol or marijuana can affect the effectiveness of her medication. (Id. at 81.)

The ALJ asked Plaintiff about the apparent discrepancy between her report of working 80 hours a week in 2011 when her employer was ill and the lack of any reported earnings that

year.  (Id. at 66.)  She explained that she had been paid in cash and the work had been intermittent.  (Id.)  She further testified that she had worked up until November of that year.  (Id. at 67.)  She had gone to San Diego in November and had intended to look for a job on her return.  (Id. at 68.)  She attempted to, but her confidence was low and she did not fill out any applications.  (Id.)

Plaintiff got the job she was paid in cash for because the employer was a customer of her former employer and was contacted by her supervisor there to see if he had anything she could do after she was fired when she tested positive for marijuana in a random drug screen.  (Id. at 70-71.)  The cash job primarily was printing out orders and required only use of a mouse.  (Id. at 72.)  If her employer was not there, she would answer the telephone.  (Id.)  She sometimes worked from home.  (Id. at 73.)  This work required only that she open boxes of gaming cards and separate them into packages.  (Id.)  She was paid per case because she was slower than anyone else.  (Id. at 74.)  Her boyfriend or son sometimes helped her.  (Id.)  Asked why she could not do the job now, Plaintiff explained it was because she has no confidence and her employer then knew her limitations.  (Id. at 72.)

Plaintiff left school after the eighth grade, and can read, write, and do arithmetic.  (Id. at 83.)  She has a General Equivalency Degree (GED).  (Id. at 84.)

Ms. Gonzalez, testifying without objection as a vocational expert (VE), described Plaintiff's work history as being that of a retail sales clerk, light semi-skilled work with a

specific vocational preparation (SVP) level of three[2]; as a data entry clerk, sedentary, semi-skilled work with an SVP of four; receptionist, sedentary, semi-skilled with a SVP of four; stocker, heavy, semi-skilled with a SVP of four; and general office clerk, light, semi-skilled with a SVP of four. (Id. at 69.) Asked if a claimant could return to any of these jobs if she had limited use of her right dominant upper extremity to the extent that she could not do any fine or gross manipulation with the hand other than use it as a helper for lifting, Ms. Gonzalez replied that some customer service representative positions could be performed one-armed. (Id. at 69-70.)

Ms. Gonzalez was then asked to assume a claimant of Plaintiff's age, education, and work experience who is limited to light exertional work, to no overhead reaching with the right dominant upper extremity, and to no climbing of ropes, ladders, or scaffolds. (Id. at 84-85.) She cannot do fine or gross manipulation with the right dominant upper extremity more frequently than occasionally. (Id. at 85.) Asked if this claimant can perform any of Plaintiff's past relevant work, Ms. Gonzalez testified that she can do the work of a customer service representative and, if it is not typing intensive, of a receptionist. (Id.) Given the described

_____

[2]"The SVP level listed for each occupation in the DOT connotes the time needed to learn the techniques, acquire the information, and develop the facility needed for average work performance. At SVP level one, an occupation requires only a short demonstration, while level two covers occupations that require more than a short demonstration but not more than one month of vocational preparation. 2 *Dictionary of Occupational Titles* [DOT] app. C at 1009 (4th ed. 1991)." **Hulsey v. Astrue**, 622 F.3d 917, 923 (8th Cir. 2010). An SVP level of three requires over one month up to and including three months. DOT app. C, 1991 WL 688702. An SVP of four requires over three months up to and including four months. Id.

manipulative restrictions, the available customer service representative and the receptionist jobs would be reduced by 50 percent nationally and in Missouri.  (Id. at 86-87.)

If this hypothetical claimant is also limited to routine, repetitive tasks; an SVP not to exceed two; and low stress jobs requiring only occasional decision-making, work-setting changes, and work-related judgments, Plaintiff's past work is eliminated but there are still positions of ticket taker and information clerk.  (Id. at 87-88.)  These two jobs are still appropriate if the hypothetical claimant cannot use her right upper extremity at all.  (Id. at 88.) If the hypothetical claimant requires only occasional interaction with the public, coworkers, and supervisors, the two jobs cited will  not be available because they require interaction with others.  (Id. at 89.)  There are, however, other jobs, i.e., surveillance system monitor or school bus monitor.  (Id. at 89-90.)  The former can be high stress at times and the latter requires interaction with children.  (Id.)  The ALJ noted that the stress and interaction would fit within her hypothetical.  (Id.)

If a hypothetical claimant needed an extra, fifteen minute break every day or was absent two days a month, she would not be able to work competitively.  (Id. at 88-89.)

Asked if her testimony was consistent with the *Dictionary of Occupational Titles* (*DOT*), Ms. Gonzalez replied that it was.  (Id. at 90.)

In response to a question by Plaintiff's attorney, Ms. Gonzalez testified that the *DOT* does not define one-handed or two-handed jobs or distinguish so in terms of manipulation or handling.  (Id. at 92.)  Although it would be easier for a person to do data entry with an ergonomic keyboard, that accommodation was not necessary.  (Id. at 92-93.)  Ms. Gonzalez

was then asked by Plaintiff's attorney how an ability to only use the non-dominant hand would affect the availability of customer service or receptionist jobs if typing or data entry was required. (Id. at 93.) She did not believe that the necessarily slower rate at which a person able to use only her non-dominate hand would do typing or data entry would further reduce the numbers of available jobs beyond the 50 percent she already considered. (Id. at 93.) The 50 percent was based on her experience in placing individuals in such jobs. (Id. at 93, 94, 97.) The 50 percent was a "very conservative" figure; there might be more jobs available. (Id. at 95.) Ms. Gonzalez cited a study about jobs a person can do one-armed and, in response to a request by Plaintiff's counsel, said she would submit it or the cite. (Id. at 95-96.) She reaffirmed that the availability of jobs with the limitations described by the ALJ was based on her experience. (Id. at 97.)

Because the hearing had gone into the time allotted for another hearing at which two medical experts were to testify, the ALJ offered to schedule a supplemental hearing. (Id. at 96.) The offer was decline. (Id.)

The ten-page study, *Employer Validation of Jobs Performed with One Arm*, was originally published in 2008 in the Journal of Forensic Vocational Analysis and was later submitted by Ms. Gonzalez. (Id. at 295-304.)

### Medical and Other Records Before the ALJ

The administrative record before the ALJ also included forms Plaintiff completed as part of the application process, documents generated pursuant to her applications, records from health care providers, and assessments of her physical and mental functional capacities.

On a Disability Report, Plaintiff disclosed that she stopped working on November 12, 2010, when she was discharged after failing a random drug screen.  (Id. at 219.)  She had obtained a GED in February 2010 and had completed a seven-month marketing and management program in June 1990.  (Id.)

Plaintiff's daughter completed a Function Report on her mother's behalf.  (Id. at 228-235.)  She usually visited with Plaintiff once a week for four to five hours.  (Id. at 228.)  She was not sure what Plaintiff did during the day.  (Id.)  She reported that Plaintiff could no longer do anything that involved her right hand.  (Id. at 229.)  Plaintiff had difficulties with such tasks as tying her shoes and brushing her hair.  (Id.)  Plaintiff no longer cooked a full-course meal and had trouble doing such chores as washing dishes, doing the laundry, and carrying heavy items.  (Id. at 230.)  Plaintiff shopped once a week for a couple of hours.  (Id. at 231.)  Plaintiff spent time with family and talked daily with people.  (Id. at 232.)  Her impairments adversely affected her abilities to lift, use her hands, reach, and complete tasks.  (Id. at 233.)  She followed instructions very well.  (Id.)  She was anxious when around authority figures, but could get along with them well.  (Id.)  She had difficulty handling stress and changes in routine.  (Id. at 234.)

A few months later, Plaintiff completed a Function Report.  (Id. at 237-44.)  She described her daily activities as watching television, spending time with friends and family, practicing using the computer left-handed, eating, and taking care of personal hygiene.  (Id. at 237.)  Her other responses generally mirrored those of her daughter.  (Id. at 238-44.)

Plaintiff's last reportable earnings were in 2010.  (Id. at 201-02.)

Robert Mobley, s single decision-maker,[3] assessed Plaintiff's physical and mental residual functional capacities. (Id. at 98-117.) She had medically determinable impairments of a disorder of muscle, ligament, and fascia; alcohol and substance addiction disorder; anxiety disorder; and affective disorder. (Id. at 102.) Only the first was severe. (Id.) She did not have any restrictions in her activities of daily living or any difficulties in maintaining social functioning. (Id.) She had only mild difficulties in maintaining concentration, persistence, or pace. (Id.) She had not had any repeated episodes of decompensation of extended duration. (Id.) It was noted that Plaintiff had reported that the only thing that prevented her from working was the problem with her hands. (Id.) She had exertional limitations of being able to occasionally lift or carry ten pounds and frequently lift or carry less than that amount. (Id. at 103-04.) She could stand, sit, or walk for approximately six hours in an eight-hour day. (Id. at 104.) She was limited in her ability to push or pull with her right upper extremity. (Id.) She was also limited in her ability to do gross or fine manipulation with her right hand. (Id.) She had no postural, visual, environmental, or communicative limitations. (Id.)

Plaintiff's medical records begin in 2008 when she was seen at St. Louis ConnectCare (SLCC) for a consultation for her alcoholism. (Id. at 392.) She was taking Phenytek, an anti-

---

[3]See 20 C.F.R. §§ 404.906, 416.1406 (defining role of single decision-maker under proposed modifications to disability determination procedures). See also **Shackleford v. Astrue**, 2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

epileptic drug, had not had a drink for over a week, and was encouraged to participate in Alcoholics Anonymous (AA). (Id.)

On June 14, 2010, Plaintiff was admitted to the St. Anthony's Medical Center (St. Anthony's) after going to the emergency room with complaints of persistent and worsening headaches for the past nine to ten days. (Id. at 321-50.) The day she went to the emergency room, she had had difficulty using her right hand at work. (Id. at 323.) The past two days, she had also experienced vision problems. (Id. at 321.) She had a history of high blood pressure and high cholesterol. (Id.) She did not take any prescription medications, but did "take[] a significant amount of ibuprofen for pain issues." (Id.) She drank ten to twelve beers a day, smoked two packs of cigarettes a day, and used marijuana intermittently. (Id. at 323.) She had high blood pressure on admission. (Id. at 324.) On examination, she was alert and oriented and had a steady gait, normal muscle tone and strength, and symmetric facial movements. (Id. at 323.) A computed tomography (CT) scan of her head and a magnetic resonance angiogram (MRA) of her brain were each unremarkable. (Id. at 323, 339, 342.) An magnetic resonance imaging (MRI) of her brain revealed abnormal diffusion restriction and an abnormal FLAIR (Fluid Attenuated Inversion Recovery) signal involving the left high parietal lobe and left centrum semiovale. (Id. at 340.) She was placed on a stroke protocol, and her right hand weakness completely resolved. (Id. at 324.) She was prescribed Imitrex for her migraines and Zofran and Toradol to be taken if the Imitrex did not work. (Id.) She was discharged two days after admission. (Id.)

On June 24, Plaintiff consulted Robin Musselman, R.N.C.S., at SLCC tor problems with her right hand. (Id. at 387, 91-92.) Plaintiff reported that she had been hospitalized after having vision problems, headaches, and an inability to use her right hand. (Id. at 387.) Before then, she had been drinking heavily. (Id.) Her handwriting was back to normal, and she could use a computer. (Id.) She had taken her cousin's Xanax and had stopped drinking for four days. (Id. at 391.) She was taking verapamil for high blood pressure. (Id. at 391.) On examination, she had full grip strength and normal rapid alternating hand movements. (Id. at 387.) She was diagnosed with status post cardiovascular accident, alcoholism, tobacco abuse, and hypertension. (Id.) She was to continue taking verapamil and was also prescribed Dilantin, another name for Phenytek. (Id.)

Plaintiff saw Ms. Musselman again on July 8. She had been taking her sister's Xanax and was having some shaking and slight anxiety. (Id. at 388, 390.) She was waking up with headaches, which were relieved with Tylenol. (Id.) She had been sober for nine days. (Id. at 388.) She was advised that she was substituting one substance for another by taking Xanax and would not receive a prescription for Xanax through SLCC. (Id. at 388.) Plaintiff indicated she was not going to stop taking Xanax and was not going to see a counselor or a psychiatrist. (Id.) Her prescription for verapamil was renewed. (Id.)

Three weeks later, Plaintiff returned to Ms. Musselman for anxiety and panic attacks. (Id. at 385, 386.) She had stopped drinking and was having shakes, feelings of doom, and panic attacks. (Id. at 385.) Her fingertips would get numb. (Id.) She requested a pill for anxiety. (Id.) On examination, Plaintiff was in no apparent distress, appropriately dressed and

groomed, and with good eye contact.  (Id.)  "She [was] somewhat confrontational."  (Id.)  She was diagnosed with panic disorder, prescribed BuSpar (an anti-anxiety medication), and referred to a Dr. Asher.  (Id.)

When seeing Ms. Musselman on August 16, Plaintiff reported that she had started drinking two weeks earlier and was drinking twelve beers a day.  (Id. at 384.)  She was under stress because her granddaughter was born addicted to heroin, as was the baby's mother and father (Plaintiff's son).  (Id.)  She was anxious and was considering participating in a twelve-step program.  (Id.)  She was on the waiting list to see Dr. Asher.  (Id.)

One week later, Plaintiff saw Jaron Asher, M.D.  (Id. at 376-83.)  She reported drinking eight beers a day during the work week and twelve to fourteen beers a day on the weekend.  (Id. at 377.)  She complained of severe anxiety and requested a prescription for a benzodiazepine.  (Id. at 376.)  The request was denied.  (Id.)  On examination, Plaintiff had soft, monotonic speech; good eye contact; goal-directed thoughts; fair insight and judgment; okay grooming; and a depressed affect.  (Id.)  She was diagnosed with alcohol dependence and depression/anxiety not otherwise specified.  (Id.)  Her current Global Assessment of Functioning (GAF) was 50.[4]  (Id.)  She was prescribed naltrexone, used to treat alcohol

---

[4]"According to the [DSM-IV-TR at 32], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'"" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010).  A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted).

dependence, and was to start taking citalopram, an anti-depressant, after the first week on naltrexone. (Id.)

Plaintiff was seen on September 28 at the emergency room at St. Anthony's for complaints of lack of coordination in her right hand that had begun after she played solitaire on her computer all afternoon.[5] (Id. at 317-20.) The impression was of neuralgia or, alternatively, an injury caused by overuse. (Id. at 318.) She was to follow-up with her primary care physician. (Id. at 320.)

Plaintiff returned to the emergency room six days later with complaints of a headache, anxiety, and difficulty speaking for the past two days. (Id. at 313-16.) She was found to have an elevated blood pressure and was instructed to follow up with her primary care physician within the next twenty-four hours. (Id. at 316.)

On October 11, Plaintiff reported to Ms. Musselman that she had not taken the naltrexone. (Id. at 373-74.) She had poor eye contact, normal gait, and a positive Tinel's sign on the right.[6] (Id. at 373.) Lisinopril, for high blood pressure, was prescribed in addition to the verapamil. (Id.)

Plaintiff met with Deborah Moormann, M.S.W., on October 27. (Id. at 372.) Plaintiff reported that she drank to cope with anxiety and stress and was frustrated that her physician

---

[5]Plaintiff later informed Ms. Musselman that she had been playing solitaire on the computer for twelve straight hours. (Id. at 373.)

[6]Tinel's test is used to in the diagnosis of carpal tunnel syndrome. See Jonathan Cluett, M.D., Carpal Tunnel Syndrome http://orthopedics.about.com/cs/carpaltunnel/a/carpaltunnel (last visited Oct. 27, 2015). A Tinel's sign is present when tingling in the fingers is made worse by tapping the median nerve along its course in the wrist. Id.

would not prescribe an anti-anxiety medication. (Id.) Her drinking was discussed; it was recommended she delay drinking her first beer by thirty minutes and reduce her drinking by one beer a night. (Id.)

Two weeks later, Plaintiff reported to Ms. Moormann that she had been successful in reducing her drinking approximately one-half the time. (Id. at 372.) She was still reluctant to start taking the naltrexone. (Id.)

On December 9, Plaintiff reported having been fired after she tested positive for marijuana use, but then having quickly found another job she liked better. (Id. at 371.) She was not ready to quit drinking, but hoped to be in the future. (Id.)

Plaintiff consulted Ms. Musselman on December 27 about her right hand problems. (Id. at 370-71.) She was not able to use her right hand, which was weak and felt numb. (Id. at 370.) She had been given a splint to use at night. (Id.) She was still drinking, but was not eating. (Id.) She denied having any mental confusion. (Id.) She had full shoulder strength and could extend both elbows against resistance. (Id.) She could not keep the fingers on her right hand spread out against resistance. (Id.) She was diagnosed with possible neuropathy secondary to alcoholism versus carpal tunnel. (Id.) She was to keep her splint on during the day. (Id.) On learning that she slept with her right arm above her head, Ms. Musselman encouraged Plaintiff to sleep with the arm down. (Id.)

At her January 2011 session with Ms. Moormann, Plaintiff reported she was eating healthily but was concerned about not being able to use her right hand. (Id. at 368-69.) At her February session, she reported she was not eating well because she was busy during the

day.  (Id. at 366-67.)  She still could not use her right hand and was, therefore, applying for Medicaid.  (Id. at 367.)  She was anxious when she was not drinking.  (Id. at 366.)

Plaintiff was seen by Dr. Asher on February 16.  They discussed the strengths and weaknesses of two medications, naltrexone and baclofen, prescribed to treat alcoholism.  (Id. at 363.)  Plaintiff elected to try the latter.  (Id.)  On examination, she had adequate grooming, normal speech, good eye contact, and fair insight and judgment.  (Id.)  Her affect was anxious but hopeful.  (Id.)  Her GAF was 52.[7]  (Id.)

Six days later, Plaintiff was also prescribed Dilantin to help her quit drinking.  (Id. at 362.)

In March, Plaintiff reported to Ms. Moormann that she had not had a beer in nine days.  (Id. at 361.)  The baclofen was helping with anxiety.  (Id.)  She occasionally felt anxious, but the feeling did not last long.  (Id.)  A friend was going to pay for her to have dental work done.  (Id.)

When seen by Dr. Asher on April 6, Plaintiff had had two weeks of sobriety, then a ten-beer relapse, more sobriety, and then two beers the night before.  (Id.)  She was ambivalent about stopping drinking, but was less ambivalent than before.  (Id.)  She was agreeable to taking naltrexone in addition to the baclofen.  (Id.)  On examination, she was as before with the exception of a less-anxious, more-hopeful affect.  (Id.)  Her GAF was 53.  (Id.)

_____

[7]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV-TR at 34 (emphasis omitted).

Plaintiff saw Ms. Musselman on April 18 for refills of lisinopril and verapamil and for complaints of lack of coordination in her right arm. (Id. at 358-59.) She was not having pain or numbness in that hand, but could not use the right arm at all. (Id. at 358.) The splint had not worked. (Id.) On examination, she could not correctly grip a pen but could reach without a tremor. (Id.) Her upper arm strength was five out of five. (Id.) She was to be referred to a neurologist. (Id.)

When seen by Ms. Moormann on May 4, Plaintiff had had her top teeth pulled in preparation for dentures and had started regularly drinking again. (Id. at 357.) She wanted to see a different psychiatrist. (Id.)

Five days later, Plaintiff consulted a neurologist, Eli Shuter, M.D., about the lack of coordination in her right hand. (Id. at 397-99, 409-11.) She reported that the problem had begun in June 2010, causing her to be unable to write and to have such symptoms as headaches. (Id. at 397.) She had not had any headaches since being seen then at St. Anthony's. (Id.) Her right hand coordination had improved, but had reoccurred the previous August and December. (Id.) Since December, it had not improved. (Id.) She was unable to write or use utensils with her right hand. (Id.) She could dress herself, but did not wear shirts with buttons and had difficulty hooking her bra. (Id.) She could lift things with that hand, but could not coordinate movements with it. (Id.) The hand was occasionally numb and tingling. (Id.) She drank six to eight cans of beer daily, smoked two packs of cigarettes a day, and used marijuana daily. (Id.) She reported no anxiety, depression, or sleep disturbance. (Id. at 398.) On examination, she had an euthymic mood. (Id. at 399.) Dr. Shuter opined that

it was unlikely Plaintiff had had a stroke or migraine and recommended a magnetic resonance imaging (MRI) of her brain and cervical spine. (Id.) He diagnosed her with ataxia right hand incoordination. (Id.) Plaintiff was to follow-up in four weeks. (Id.)

Plaintiff had MRIs of her brain, brain stem, and cervical spine on June 1. (Id. at 428-31.) There was no evidence of an acute infarct or hemorrhage or of demyelinating disease in the brain or cervical spine. (Id. at 428-29.) There was hyperintensity in the high left frontal and high left parietal cortex and subcortical white matter, "most consistent with prior brain injury, likely an old infarct." (Id. at 429.) The cervical spine was essentially normal. (Id.)

One week later, Plaintiff reported to Ms. Moormann that she was drinking beer daily. (Id. at 356.) She had quit her job because "her boss was very demanding and mean" and "she couldn't take it anymore." (Id.) She was going to look for another job. (Id.)

Dr. Shuter saw Plaintiff again on July 11. Plaintiff reported she had been stable since her last visit with no improvement in her right hand coordination. (Id. at 405-08, 540-43.) Her current medications included lisinopril and verapamil. (Id. at 405.) Her alcohol, tobacco, and marijuana use was as before. (Id. at 405-06.) On examination, she had a positive Hoffman's sign on the right.[8] (Id. at 407.) The strength was five out of five in her right upper extremity, albeit there was a "very subtle weakness overall when compar[ed] simultaneously to [the left upper extremity]." (Id.) He diagnosed her with "lacunar syndrome – right lesion (dysarthria - clumsy hand) [r]ight hand incoordination." (Id.) Differential diagnoses included stroke of

---

[8]A positive Hoffman's sign is indicative of an upper motor neuron lesion from spinal cord compression. Clifford R. Wheeless, III, M.D., Hoffman's Sign, http://www.wheelessonline.com/ortho/hoffmans_sign (last visited Oct. 27, 2015).

vasculitis.  (Id.)  Plaintiff was to have a computed tomographic angiography (CTA) to investigate the cause of her right hand problems.  (Id.)  The CTA, other than abnormality present on previous MRI of her brain, was normal.  (Id. at 426-27.)

Plaintiff explained to Ms. Moormann on July 20 that she had returned to working for the man with whom she had had a disagreement.  (Id. at 520.)  The man was in the hospital; consequently, Plaintiff was running his business.  (Id.)  She had worked eighty hours the last week, some of which had been on her home computer.  (Id.)  She was smoking more and eating less due to the stress.  (Id.)

 On August 15, Plaintiff was seen by Glenn Lopate, M.D., at SLCC for a follow-up on her CTA.  (Id. at 536-39, 558-61.)  On examination, Plaintiff had abnormal muscle tone and decreased finger flexion in her right hand, but normal strength.  (Id. at 538.)  There was no impairment of her finger-to-nose movement.  (Id.)  She had a positive  Hoffman's sign on the right.  (Id. at 538-39.)  Her mood was euthymic.  (Id. at 539.)  It was noted that her head CTA was negative for vascular disease.  (Id. at 539.)  A hypercoaguability panel was to be done to test for a hypercoagulable disorder and rule out that disorder versus a complicated migraine as the cause of Plaintiff's right-hand problems.  (Id.)  Plaintiff was to return in six weeks.  (Id.)

Two days later, Plaintiff saw Dr. Asher.  (Id. at 518.)  She reported she had set a date the following Monday to stop drinking.  (Id. at 518.)  She insisted on getting Xanax, explaining that without alcohol her anxiety would cause her to start drinking again unless she could take a benzodiazepine.  (Id.)  Dr. Asher declined, but prescribed Seroquel and baclofen.  (Id.)  Plaintiff agreed to try both.  (Id.)  Her GAF was 50.  (Id.)

Plaintiff informed Ms. Moormann on August 17 that she was frustrated with Dr. Asher because he would not prescribe a benzodiazepine for her. (Id. at 519.) She was doubtful that Seroquel would help. (Id.) She was working "all day and evening," with the evening hours spent at home on her computer. (Id.)

Plaintiff saw Dr. Asher on September 1, explaining that she had previously gone through withdrawal without seizures. (Id. at 516.) Baclofen was helping to reduce anxiety and cravings; Seroquel was helping her sleep. (Id.) Her GAF was 53. (Id.)

She saw Ms. Moormann the same day. (Id. at 517.) She was pleased with her upper denture and had been sober for eleven days. (Id.)

Ms. Moormann called Plaintiff on September 21 after she did not show for an appointment or call to cancel. (Id. at 515.) Plaintiff explained the next day that she had forgotten and was still not drinking. (Id. at 514.) She was waiting to hear back from an occupational therapist about an appointment for her right hand problems. (Id.)

Ms. Moormann called Plaintiff again on October 10 because she had never called to reschedule her appointment. (Id. at 513.) Plaintiff explained that she had been overwhelmed at work. (Id.) Ms. Moormann left a voice mail message on November 18 asking Plaintiff to call her back after Plaintiff failed to show for an earlier appointment. (Id. at 511-12.)

Five days later, Plaintiff saw Ms. Moormann. (Id. at 509-10.) Plaintiff reported that she had returned to daily drinking at the end of October, but had set a new quit date at the end of December. (Id. at 509-10.) She was no longer working and was going to take time to rest before looking for a new job. (Id. at 509.) She had gone to San Diego for her son's graduation

from boot camp. (Id.) On examination, her mood and affect were fair; her insight and judgment were good; her speech was at normal rate and occasionally loud; her motor activity was normal; her flow of thoughts was organized and goal-directed; and her interview behavior was cooperative. (Id. at 509-10.) She was well dressed and groomed and was oriented to self, place, and time. (Id. at 509.)

When seen by Dr. Asher on December 23, Plaintiff was continued on Seroquel and baclofen; Dilantin was added to her prescriptions. (Id. at 506.) Her GAF was 49. (Id.) When seen the same day by Ms. Moormann, Plaintiff informed her that her new date to quit drinking was mid-January. (Id. at 507-08.) On examination, she was as before. (Id. at 507.)

Plaintiff saw Ms. Musselman on January 10, 2012, for a follow-up and influenza vaccination and for her complaints of reduced strength in right arm with a lack of coordination. (Id. at 503-05.) Her diagnoses included benign essential hypertension, stroke syndrome, and alcoholism. (Id. at 504.) Her medications included baclofen, lisinopril, Phenytek, Seroquel, and verapamil. (Id. at 503.)

Ten days later, Plaintiff informed Dr. Asher that she had stopped drinking two days earlier and then started the Dilantin and Seroquel. (Id. at 499.) Her medications were continued. (Id.) The same day, she and Ms. Moormann developed a treatment plan to help Plaintiff stop drinking. (Id. at 500-01.)

It was noted at Plaintiff's annual gynecological examination on January 30 that she had stopped drinking two weeks earlier. (Id. at 492-96.)

Plaintiff did not show on February 2 for her appointments with Ms. Moormann and Dr. Asher (Id. at 491.)

She did see Ms. Musselman on February 13 for a follow-up appointment for her hypertension. (Id. at 487-89.) Plaintiff reported not having had a beer in four weeks. (Id. at 487.) She was continuing to smoke two packs of cigarettes a day. (Id. at 488.) Plaintiff reported that she was not able to work because of her right arm. (Id.)

Plaintiff informed Dr. Asher on February 24 that she and her boyfriend were only drinking occasionally. (Id. at 486.) Her medications were continued. (Id.)

She informed Ms. Moormann on March 1 that she had been able to completely abstain from drinking, with two exceptions. (Id. at 484-85.) Her mental status examination was normal. (Id. at 484.)

Plaintiff was seen again by Dr. Asher on March 15. (Id. at 482-83.) She was reportedly drinking only once or twice a week. (Id. at 483.) She was continued on baclofen, and her dosage of Seroquel was increased to address sleeping problems that had arisen in the past week. (Id.) Her GAF was 55. (Id.)

On March 19, Plaintiff consulted Samer Tabbal, M.D., about her dysarthria[9] and clumsy hand. (Id. at 553-57.) She had reduced her alcohol use to one to two drinks a week, but had continued to smoke two to three packs of cigarettes a day. (Id. at 553.) Her examination

---

[9]"Dysarthria is a condition in which the muscles . . . use[d] for speech are weak or [the person] ha[s] difficulty controlling them." See Dysarthria, http://www.mayoclinic.org/diseases-conditions/dysarthria/basics/definition/con-20035008 (last visited Oct. 27, 2015).

findings were the same as when seen by Dr. Shuter. (Id. at 556.) Dr. Tabbal diagnosed Plaintiff with left pariatal ischemis stroke and suggested that her primary care physician obtain a 72-hour Holter to evaluate Plaintiff for paroxysmal atrial fibrillation due to her long history of alcohol abuse. (Id. at 556) She was also to have an electroencephalogram (EEG) to evaluate her for possible seizure disorder. (Id.) Alcohol and smoking cessation was strongly recommended. (Id.) The EEG was "abnormal due to mild generalized slowing" indicative of diffuse cerebral dysfunction. (Id. at 424-25.) An echocardiogram later performed was negative with no left atrial enlargement and with a normal ejection fraction. (Id. at 527, 535, 551-52.)

At her March 28 session with Ms. Moormann, Plaintiff reported she was doing "'pretty good.'" (Id. at 480-81.)

Plaintiff met with Ms. Moormann on April 5 to review and renew her treatment plan. (Id. at 584-85.) Two weeks later, Plaintiff reported being increasingly irritable; she was drinking twice a week. (Id. at 478-79.)

When seen by Dr. Asher on April 25, Plaintiff was less depressed and irritable; an increased dosage of Cymbalta, an anti-depressant, had helped. (Id. at 582-83.) Her sleeping problems had increased; consequently, her dosage of Seroquel was doubled. (Id. at 582.) The timing of her Cymbalta dosage was changed due to concern it was causing sleeping problems. (Id. at 583.) Plaintiff pledged to drink no more than eight beers a night. (Id.)

Although Plaintiff was sick and unable to keep her May 3 appointment with Ms. Moormann, she reported that things were going well otherwise. (Id. at 581.) Plaintiff did see

Dr. Asher that day. (Id. at 475-76.) Baclofen and an increased dosage of Seroquel were prescribed. (Id.) Her GAF remained at 55. (Id. at 476.)

Five days later, Plaintiff informed Ms. Musselman that she had problems with her right knee if she stood for two long. (Id. at 576-80.) She also had weakness and a lack of coordination in her right arm and occasional involuntary muscle movement of the thumb and third finger in her right arm. (Id. at 576.) Plaintiff explained that she had not gone back to Barnes Jewish Hospital for occupational therapy because she had to wait for three hours to be seen. (Id. at 577.) She had stopped drinking two weeks earlier. (Id.) She was unable to work because of her arm. (Id.)

When seen by Ms. Moormann on May 10, Plaintiff reported that she was watching her grandchildren during the week and overnight once or twice a week. (Id. at 574-75.) She had been "mostly successful with limiting herself to 8 beers a night." (Id. at 574.)

On May 14, Plaintiff reported to Dr. Shuter that she was doing well with no new or worsening symptoms. (Id. at 527-31, 545-49.) Plaintiff also reported having persistent clumsiness and decreased dexterity in her right hand and "intermittent word finding difficulties." (Id. at 527.) She had decreased her drinking to one to two drinks a week. (Id.) In addition to the examination findings of Dr. Lopate described above, Dr. Shuter noted that Plaintiff's right finger tapping was slow and her "[t]here was fixation of finger and right arm with finger/arm rotation." (Id. at 530.) Plaintiff was to continue with her current medications and was to return in six to twelve months. (Id.)

Three days later, Plaintiff informed Ms. Moormann that she was not drinking every day. (Id. at 473-74.) On June 7, Plaintiff reported limiting herself to eight beers a day. (Id. at 594-95.) She missed her June 20 appointment with Ms. Moormann. (Id. at 471.)

Ms. Moormann spoke with Plaintiff over the telephone on July 13. (Id. at 470.) Plaintiff explained that one of her sons had to have surgery, she was babysitting her grandson twice a week, and she was drinking more to cope with the stress. (Id.)

Plaintiff telephoned Ms. Moormann on August 24 after forgetting about her appointment that day. (Id. at 469.)

Plaintiff saw Ms. Musselman on September 6 for a follow-up appointment and refill of prescriptions. (Id. at 461-65.) She requested a medication for depression and anxiety that would also help her quit smoking. (Id. at 461.) She had stopped drinking two weeks earlier. (Id. at 462.) On examination, her appearance was normal, but her affect was not. (Id. at 463.) It was "[f]lat but demanding." (Id.) Her mood was dysthymic. (Id.) She reported being anxious, depressed, hopeless, and anhedonic. (Id.) She was counseled about how to stop smoking. (Id. at 465.)

Four days later, Plaintiff reported to Dr. Asher that she had been drinking for several weeks, but had recently stopped. (Id. at 458-60.) She was angry and sad and wanted to try an anti-depressant. (Id. at 459.) She reported experiencing fatigue and decreased concentration one to three times a week; poor appetite four to five days a week; low self-esteem, anhedonia, and feelings of hopelessness or depression six to seven times a week. (Id. at 460.) Her

previous prescriptions for baclofen and Seroquel were renewed; Cymbalta was added.  (<u>Id.</u> at 459.)

When meeting with Ms. Moormann later that month, Plaintiff informed her that she was feeling better on the Cymbalta.  (<u>Id.</u> at 455-56.)  She was sporadically drinking, e.g., she would not drink at all for a few days and then drink daily for a few days.  (<u>Id.</u> at 455.)  She was watching two grandchildren, a baby and a two-year old, while their mother was in mandated treatment for a heroin addiction and was babysitting another grandson three days a week.  (<u>Id.</u>)  She reported that she could manage the child care.  (<u>Id.</u>)

Plaintiff again described Cymbalta as helpful when she saw Ms. Moormann on October 26.  (<u>Id.</u> at 453-54.)  She was drinking, but not daily.  (<u>Id.</u> at 454.)  She had regained some use of her right hand, but was still not having any physical or occupational therapy.  (<u>Id.</u>)

Plaintiff did not show for her November 12 appointment with Dr. Asher.  (<u>Id.</u> at 451.)

She did keep a November 30 appointment with Ms. Moormann.  (<u>Id.</u> at 449-50.)  She was tired as two of her grandchildren were staying with her daughter at night and with her during the day and alternate weekends.  (<u>Id.</u> at 449-50.)

Plaintiff informed Ms. Moormann when seeing her on December 14 that she had been without her Celexa (a brand name for citalopram) fo a month because she did not have the co-pay.  (<u>Id.</u> at 447-48.)  She now had the money, however, and was going to pick it up.  (<u>Id.</u>)  She was caring for her son's infant and toddler.  (<u>Id.</u>)

Two weeks later, Plaintiff informed Dr. Asher that she was babysitting her three grandchildren.  (<u>Id.</u> at 445-46.)  She was described as having a depressed and frustrated affect.

(Id. at 445.)  She was drinking eight beers every night due to the stress.  (Id.)  Her dosage of Cymbalta was increased.  (Id.)

Plaintiff did not keep her January 7, 2013, appointment with Dr. Lopate.  (Id. at 524.)

When seen by Ms. Moormann four days later, Plaintiff was upset and under a great deal of stress.  (Id. at 443-44.)  She was watching her grandchildren during the week and drinking daily.  (Id. at 443.)  To relax most days, she liked to play games on the computer.  (Id.)

On February 8, Plaintiff informed Ms. Moormann that she was having problems with her daughter, with whom she shared custody of her son's two children.  (Id. at 441-42.)  She reported planning to go home that day and get drunk.  (Id.)

Twenty days later, Plaintiff reported to Dr. Asher that she was more depressed.  (Id. at 440.)  She was watching her grandchildren without the help she thought she would get from other family members.  (Id.)  Her Cymbalta prescription was increased; her baclofen and Seroquel prescriptions were renewed.  (Id.)

On March 8, Plaintiff told Ms. Moormann that she had had a low mood for the past few months.  (Id. at 438-39.)  She had regained some use of her hand, but it was still not good.  (Id. at 439.)  She was not receiving any physical or occupational therapy.  (Id.)

## The ALJ's Decision

The ALJ first found that Plaintiff met the insured status requirements of the Act through December 31, 2015, and has not engaged in substantial gainful activity since her alleged disability onset date of December 23, 2010.  (Id. at 11.)  She has severe impairments of

residuals of stroke and differential diagnosis of lacunar syndrome.[10] (Id.) Her mental impairments of anxiety, depression, and substance abuse, singly or in combination, are not severe. (Id. at 12.) Specifically, she has only mild limitations in her activities of daily living, in social functioning, and in concentration, persistence, or pace. (Id.) She has not had any episodes of decompensation of extended duration. (Id.) Her hypertension is controlled by medication. (Id. at 15.) Nor does Plaintiff have an impairment or combination of impairments that meets or medically equals an impairment of listing-level severity. (Id. at 13.)

The ALJ next determined that Plaintiff has the residual functional capacity (RFC) to perform light work with additional restrictions of (a) never climbing ropes, ladders or scaffolds; (b) never reaching overhead with her right upper extremity; (c) occasionally feeling with and performing fine and gross manipulation with her right upper extremity; (d) tolerating no more than low stress; and (e) performing routine, repetitive tasks, i.e., work with an SVP of two or less. (Id.)

When assessing Plaintiff's RFC, the ALJ evaluated her credibility. She determined that Plaintiff's credibility was lessened by (i) the lack of supporting objective evidence; (ii) her failure to follow a recommended course of treatment, i.e., occupational therapy, to improve her right hand symptoms; (iii) the need for manual dexterity in many of her daily activities, e.g., completing paperwork by hand with legible handwriting, changing diapers, and using computers; (iv) her decision to continue drinking and not take anti-anxiety medication when

---

[10]Clumsy-hand dysarthria is a type of lacunar syndrome. See Nikoloaso H. Papamitsakis, M.D., Lacunar Syndrome, http://emedicine.medscape.com/article/1163029-overview#a5 (last visited Oct. 27, 2015).

informed that the two are incompatible; (v) the discrepancy between her complaints and the consistent descriptions of her mood, affect, insight, and judgment as being fair to good; (vi) her minimal work history prior to the alleged disability onset date; (vii) her failure to report her earnings when paid in cash; (viii) her leaving work for a reason unrelated to cited impairments; and (ix) her report that she was taking time off to rest before looking for job. (Id. at 14-16.) The ALJ also discounted the references in Ms. Musselman's notes to Plaintiff being unable to work because of her arm as being inconsistent with the record and as an issue reserved to the Commissioner. (Id. at 17.) The report of Plaintiff's daughter was discounted because it is inconsistent with the record and is by a person who is not disinterested. (Id.)

With her RFC, Plaintiff is not able to return to her past relevant work. (Id.) With her age, RFC, and education, there are jobs in the national economy that she can perform. (Id. at 18.) Examples of such jobs are those of a ticket taker and information clerk. (Id.) In concluding thus, the ALJ noted that Plaintiff did not have the RFC to perform the full range of light work due to additional limitations. (Id.) The affect of these limitations on the availability of appropriate jobs had been addressed by the VE. (Id.) The VE had based her testimony on her experience and the findings of a vocational study. (Id. at 19.) The ALJ found that, based on Social Security Ruling 00-4p, the VE's testimony was consistent with the information in the DOT. (Id.)

The ALJ then concluded that Plaintiff was not disabled within the meaning of the Act. (Id.)

## Standards of Review

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. §§ 423(d)(1), 1382c(a)(3)(A). Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months. **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'" **Phillips v. Colvin**, 721 F.3d 623, 625 (8th Cir. 2013) (quoting Cuthrell v. Astrue, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.1520(a) and § 416.920 (a)). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738. Second, the claimant must have a severe impairment. See 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Bowen v. City of New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "[A]n RFC determination must be based on a claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (quoting Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007)). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

"'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3]

precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).  "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218).  After considering the *Polaski* factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Ford v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000).

At step four, the ALJ determines whether claimant can return to her past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e).  The burden at step four remains with the claimant to prove her RFC.  **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If, as in the instant case, the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  See also 20 C.F.R. §§ 404.1520(f), 416.920(f).  The Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those

impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.

## Discussion

Plaintiff argues that the ALJ erred by (1) not eliciting a reasonable explanation for the conflict between the VE's testimony and the *DOT* and (2) not properly evaluating her RFC.

"Under Social Security Ruling (SSR) 00–4p, the ALJ must 'ask about any possible conflict' between VE evidence and 'information provided in the DOT.'" **Moore v. Colvin**, 769 F.3d 987, 989 (8th Cir. 2014). "If there is an 'apparent unresolved conflict' between VE testimony and the DOT, the ALJ must 'elicit a reasonable explanation for the conflict' and 'resolve the conflict by determining if the explanation given [by the expert] provides a basis for relying on the [VE] testimony rather than on the DOT information.'" **Id.** at 989-90 (quoting S.S.R. 00–4p, 2000 WL 1898704, at *2–4 (S.S.A. Dec. 4, 2000)). <u>Accord</u> **Kemp ex rel. Kemp v. Colvin**, 743 F.3d 630, 633 (8th Cir. 2014). And, "[w]hen an ALJ has posed a hypothetical that accurately reflects [her] RFC finding, questioned the VE about any apparent inconsistencies with the relevant DOT job descriptions, and explained [her] decision to credit the VE's testimony, the ALJ has complied with SSR 00–4p, and [the Court] review[s] [her] decision under the deferential substantial evidence standard." **Welsh v. Colvin**, 765 F.3d 926, 930 (8th Cir. 2014). In the instant case, any apparent inconsistencies were inquired about and addressed.

Plaintiff and the Commissioner vigorously disagree about whether the ALJ's acceptance of the VE's explanation of any apparent inconsistency between her testimony and the *DOT* was reasonable. The focus of their disagreement is the VE's testimony about the reduction of available customer service and receptionist jobs resulting from a person's inability to reach overhead with her dominate upper extremity and ability to only occasionally feel with and perform fine and gross manipulation with her dominate upper extremity. Plaintiff correctly

notes that the ALJ determined that she could perform the work of a ticket taker and information clerk, not of a customer service representative or receptionist.

Plaintiff's past relevant work included that of a customer service representative and receptionist. (R. at 85.) In response to questions from the ALJ and from Plaintiff's attorney, the VE testified about the reduction in the available number of these two jobs if intensive typing or data entry were required and the claimant was limited in the use of her dominate upper extremity. (Id. at 86-87, 93-94.) The amount of that reduction – 50 percent – was based on the VE's experience and a study. (Id. at 93-95.) When presented with a hypothetical including all the limitations and abilities the ALJ later determined composed Plaintiff's RFC, the VE testified that, although she could not return to any past relevant work, she could work as a ticket taker or information clerk. (Id. at 88.) This answer, the VE testified, was consistent with the *DOT*. (Id. at 90.) Thus, as to the jobs at issue, the ALJ asked about any conflict with the *DOT* and the VE replied there were none. Social Security Ruling 00-4p requires an explanation by the VE only when there is a conflict between her testimony and the *DOT*. See SSR 00-4p, 2000 WL 1898704, at *2. The question of the adequacy of the VE's explanation of an apparent conflict about two jobs not at issue is, therefore, irrelevant.

Plaintiff further argues, however, that there is a conflict between the *DOT* and the VE's testimony because both the ticket taker and information clerk position require frequent handling and reaching. See *DOT* 344.667-010, 1991 WL 672863 (4th ed. rev. 1991) (ticket taker); *DOT* 237.367-046 (4th ed. rev. 1991) (information clerk). Both positions require frequent reaching and handling, i.e., one-third to two-thirds of the time, and occasional

fingering, i.e., up to one-third of the time. Each position's requirements also include manual and finger dexterity and motor coordination that can be performed by the lowest one-third, excluding 10 percent, of the population. The VE testified that both positions could be performed by a person unable to use her dominate upper extremity at all. This testimony is not inconsistent with the *DOT* requirements of frequent reaching and handling and occasional fingering, but not requiring more dexterity and coordination than that of the lowest one-third of the population.

Plaintiff next challenges the ALJ's assessment of her RFC.

First, Plaintiff argues that the assessment is fatally flawed because the ALJ did not provide a narrative statement of how it is supported by the evidence. "[Social Security Ruling 96-8p] cautions that a failure to make [a] function-by-function assessment [of a claimant's RFC] could 'result in the adjudicator overlooking some of an individual's limitations or restrictions.'" **Depover v. Barnhart**, 349 F.3d 563, 567 (8th Cir. 2003) (quoting S.S.R. 96-8p, 1996 WL 374184, *1 (S.S.A. July 2, 1996)). An ALJ does not, however, fail in her duty to assess a claimant's RFC merely because the ALJ does not address all areas regardless of whether a limitation is found. See **Id.** Instead, an ALJ who specifically addresses the areas in which she found a limitation but is silent as to those areas in which no limitation is found is believed to have implicitly found no limitation in the latter. **Id.** at 567-68. See **Renstrom v. Astrue**, 680 F.3d 1057, 1065 (8th Cir. 2012) (ALJ does not fail in duty to fully develop the record by not providing "an in-depth analysis of each piece of record"). "[T]he burden of persuasion to . . . demonstrate RFC remains on the claimant." **Lauer v. Apfel**, 245 F.3d 700,

704 (8th Cir. 2001). And, "[e]ven though the RFC assessment draws from medical sources for support, it is ultimately an administrative decision reserved to the Commissioner." **Cox v. Astrue**, 495 F.3d 614, 619 (8th Cir. 2007).

The ALJ determined that Plaintiff has the RFC to perform light work with additional restrictions of, inter alia, never reaching overhead with her right upper extremity and only occasionally feeling with and performing fine and gross manipulation with her right upper extremity. There is evidence in the record to support these restrictions on Plaintiff's use of her right upper extremity. For instance, in October 2010 she had a positive Tinel's sign in her right hand and in July 2011 had a positive Hoffman sign. In January 2011, she complained she could not use her right hand and in April 2011 she could not correctly grip a pen. In August 2011 she had decreased finger flexion and abnormal muscle tone in her right hand and in May 2012 she had decreased dexterity, incoordination, and slow finger tapping in her right hand. On the other hand, in July 2011 she had full strength, but a subtle weakness, in her right hand; in August 2011 she had normal strength in the hand and normal finger-to-nose movement; in October 2012 and again in March 2013 she reported having regained some use in the right hand. Regardless of the limitations she had in her right hand, she reported she worked on the computer, played games on the computer, and daily cared for three grandchildren, including a baby and toddler.[11]

_____

[11]Plaintiff argues that the ALJ's reference to her playing or working on the computer disregards her hearing testimony that she is now playing games only on her phone and using one finger. This argument disregards the ALJ's assessment of her credibility. That assessment, unchallenged by Plaintiff, is supported by the reasons cited by the Commissioner. (See Def.'s Mem. at 10-13.)

Plaintiff next argues that the ALJ should have ordered a consultative examination because there was no medical evidence in the record to describe her RFC. "'[I]t is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision.'" **Freeman v. Apfel**, 208 F.3d 687, 692 (8th Cir. 2000) (quoting <u>Dozier v. Heckler</u>, 754 F.2d 274, 276 (8th Cir. 1985)) (alteration in original). If, however, the medical records before the ALJ provide sufficient medical evidence to determine whether the claimant is disabled, a consultative examination is not required. **Martise v. Astrue**, 641 F.3d 909, 926-27 (8th Cir. 2011); <u>accord</u> **Johnson v. Astrue**, 627 F.3d 316, 320 (8th Cir. 2010); **Haley v. Massanari**, 258 F.3d 742, 749-50 (8th Cir. 2001).

In support of her argument the ALJ erred, Plaintiff cites **Nevland v. Apfel**, 204 F.3d 853 (8th Cir. 2000), and **Bowman v. Barnhart**, 310 F.3d 1080 (8th Cir. 2002). In *Nevland*, a remand was ordered for the solicitation of opinions by the claimant's treating physicians or, alternatively, for a consultative examination on how the claimant's impairments affected his ability to function. 204 F.3d at 858. In *Bowman*, a remand was ordered for the ALJ to contact the claimant's treating physician to ask for clarification of his "somewhat cursory" notes and for an assessment of how the claimant's impairments affect his ability to work. 310 F.3d at 1085. Neither case suggests that an ALJ must always obtain medical evidence directly addressing a claimant's RFC. Rather, as noted above, the question is whether the ALJ's RFC determination is supported by the "relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his

limitations.'"  **Moore**, 572 F.3d at 523.  In the instant case, the ALJ's determination is so supported.

### Conclusion

Considering all the evidence in the record, the Court finds that there is substantial evidence to support the ALJ's decision.  "If substantial evidence supports the ALJ's decision, [the Court] [should] not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because [the Court] would have decided differently." **Wildman v. Astrue**, 596 F.3d 959,  964 (8th Cir. 2010).  Therefore,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and this case is DISMISSED.

An appropriate Order of Dismissal shall accompany this Memorandum and Order.



/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  9th  day of November, 2015.